UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

WILLIAM L. HAGAN, M.D.                                                    PLAINTIFF

v.                                             CIVIL ACTION NO. 3:15-CV-00298-CRS

NORTHWESTERN MUTUAL LIFE                                                  DEFENDANT
INSURANCE COMPANY

## MEMORANDUM OPINION

This matter is before the court on motion of Defendant Northwestern Mutual Life Insurance Company for Judgment on the Administrative Record. For the following reasons, Defendant's motion for a Judgment on the Administrative Record will be **GRANTED**. Accordingly, Plaintiff William L. Hagan, M.D.'s Amended Complaint will be **DISMISSED WITH PREJUDICE.**

   I.   BACKGROUND

This action was brought by William L. Hagan, M.D. ("Dr. Hagan") against Northwestern Mutual Life Insurance Company ("Northwestern") alleging an unlawful denial of long-term disability benefits under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"). Bardstown Primary Care, PLLC ("Bardstown Primary Care") is the policy owner of a Group Long Term Disability ("LTD") Policy ("Policy") with Northwestern. (Admin. R. at NM 15-02722-000005.) Dr. Hagan is a family physician at Bardstown Primary Care in Bardstown, Kentucky and a member of the LTD Policy. (*Id*. at NM 15-02722-000170.)

Under the Policy, a member can meet the Definition of Disability if he satisfies either the Own Occupation Definition of Disability or the Partial Disability Definition.[1] (*Id*. at NM 15-02722-0000021.) The Own Occupation definition of Disability states, in relevant part, "You are Disabled from your Own Occupation if, as a result of Sickness, Injury, or Pregnancy, you are unable to perform with reasonable continuity the Material Duties of your Own Occupation." (*Id*. at NM 15-02722-0000022.) Next, the Partial Disability Definition states, in relevant part, "you are Partially Disabled if you are working in your Own Occupation but, as a result of Sickness, Injury, or Pregnancy, you are unable to earn more than the Own Occupation Income Level." (*Id*.) A policy member is considered to be working in his Own Occupation when he is working in "any employment, business, trade, profession, calling, or vocation that involves Material Duties of the same general character as [his] regular and ordinary employment with [his] Employer." (*Id*.) The Own Occupation Income Level is 80% of the member's Indexed Predisability Earnings. (*Id.* at NM 15-02722-0000015.)

In January of 2012, Dr. Hagan suffered a retinal hemorrhage in his right eye, resulting in a loss of "all vision in the right eye… with no hope of recovery." (*Id*. at NM 15-02722-000068.) Medical records also indicate that, prior to the retinal hemorrhage, Dr. Hagan had "poor vision of longstanding in both eyes." (*Id*. at NM 15-02722-000070.) Dr. Hagan received short-term disability payments from Northwestern beginning February 13, 2012. He also submitted a claim for LTD under the Policy. (Id. at NM 15-02722-0000283.) Dr. Hagan was authorized by his treating ophthalmologist to return to work part-time beginning March 5, 2012. (*Id*. at NM 15-02722-0000141.) On April 9, 2012, Bardstown Primary Care notified Northwestern that Dr.

---

[1] A member of this policy may also meet the Definition of Disability if he satisfies the Any Occupation Definition of Disability. This definition does not pertain to Dr. Hagan's claim.

Hagan's salary would be reduced by 25% to reflect his part-time return to work. (*Id*. at NM 15-02722-0000301.)

Northwestern began its review of Dr. Hagan's LTD claim in February of 2012. The review included an investigation into Dr. Hagan's medical, vocational, and financial information. (*Id*. at NM 15-02722-0000155; NM 15-02722-0000158.) Northwestern requested medical records from Dr. Susan Berberich and Dr. Charles Barr, two of Dr. Hagan's treating physicians. (*Id*. at NM 15-02722-0000094; NM 15-02722-0000106.) On May 15, 2012, Northwestern also advised Dr. Hagan that it had contacted Dr. Charles Barr directly concerning his specific limitations and restrictions. (*Id*. at NM 15-02722-0000256.) Dr. Gilbert Child, a physician and independent contractor hired by Northwestern, provided an independent review of the medical records obtained by Northwestern. (*Id*. at NM 15-02722-0000069.)

Pursuant to the above information and review, Northwestern sent Dr. Hagan a letter on July 16, 2012 advising him that he was approved for LTD benefits. (Id. at NM 15-02722-0000239-42.) The letter explained that his claim was approved because of his "inability to perform [his] own occupation due to the limitations and restrictions imposed by [his] medical condition." (*Id*.) Northwestern also informed him that his total monthly LTD benefits would be reduced by his Work Earnings[2] since he was working as a physician part-time. (*Id*.) Specifically, Northwestern calculated his monthly pre-disability income at $13,730.30 and his current monthly Work Earnings at $7,499.43. (*Id*.) Payment of benefits would apply retroactively to April 29, 2012, the date when his short-term disability payments ended. (*Id*.) Northwestern further advised that quarterly documentation of Work Earnings must be submitted to prevent an overpayment of benefits. (*Id*.)

---

[2] The Policy defines Work Earnings as "your gross monthly earnings from work you perform while Disabled, including earnings from your Employer, any other employer, or self-employment." (*Id*. at NM 15-02722-0000023.)

On October 25, 2012, Northwestern requested Dr. Hagan's updated financial information as part of its periodic review of Dr. Hagan's LTD claim. (*Id*. at NM 15-02722-0000358.) In a letter to Northwestern dated November 9, 2012, Dr. Hagan admitted he was currently working full-time hours, but worked at a "much slower pace." (*Id*. at NM 15-02722-0000223.) He explained that he could no longer perform certain procedures requiring accurate vision, such as suturing and biopsies, and that he was seeing only half of the number of patients he was seeing before his disability. (*Id*.) With this letter, Dr. Hagan also submitted his payroll information and his current procedural terminology ("CPT") codes, which identified his medical procedures and billing charges through a national coding system. (*Id*.)

In a November 14, 2012 letter, Northwestern informed Dr. Hagan that, after reviewing his November 9 letter and the supporting financial information, he no longer met the Definition of Disability. (*Id*. at NM 15-02722-0000170.) Specifically, Northwestern found that he did not meet the Own Occupation Definition of Disability because he had returned to work full-time as a physician and was performing Material Duties of a physician. (*Id*.) Northwestern acknowledged that Dr. Hagan's injury caused him to work at a slower pace, and likewise acknowledged that he could no longer perform some specific procedures, but concluded that the duties he was performing on a full-time basis were still Material Duties of a physician such that he did not meet the Own Occupation Definition of Disability. (*Id*.)

Northwestern also explained that Dr. Hagan did not qualify for benefits under their Partial Disability Definition. (*Id*. at NM 15-02722-0000171.) The Partial Disability Definition requires a policy member to earn less than his Own Occupation Income Level; accordingly, in order to meet this definition, Dr. Hagan would have to be earning less than $10,984.24 per

month.³ (*Id.*) Yet, Dr. Hagan's updated financial information showed he earned an average of $11,835.17 per month between April 1, 2012 and October 31, 2012. (*Id.*) Additionally, a review of his CPT charges showed that he was collecting 80.82% of his 2011 billing charges despite the fact that his ability to generate billable units had dropped by about 25%. (*Id.*) In reference to the 25% decrease in billable units, Northwestern stated that "it appears you have accommodated for that by billing other types of procedures and procedures that may provide somewhat higher charges." (*Id.*) Lastly, Northwestern's letter informed Dr. Hagan that he had been overpaid on his claim by $24,800.08 in light of the updated financial documents. (*Id.*) Northwestern requested a check reflecting this amount pursuant to the Policy and the reimbursement agreement that Dr. Hagan had previously signed. (*Id.*)

Ultimately, Northwestern stated that, "we acknowledge and understand that you are working with a medical condition that has reduced your functional work capacity. However, your continued ability to earn above the allowable levels has disqualified you from receiving additional benefits from this policy at this time." (*Id*. at NM 15-02722-0000172.) The November, 14 letter further informed Dr. Hagan that he had a right to request a review of the decision within 180 days and that he had the right to submit additional information in connection with the claim to be considered on review. (*Id.*)

Upon Dr. Hagan's request, Northwestern's Administrative Review Unit ("ARU") began reviewing Dr. Hagan's LTD claim in August of 2014.⁴ (Id. at NM 15-02722-0000200.) In his

---

³ Dr. Hagan's Predisability earnings were calculated at $13,730.30. Therefore, Dr. Hagan's Own Occupation Income Level is 80% of $13,730.30, or $10,984.24.
⁴ The review did not commence within 180 days of Northwestern's decision as per the Policy. In February of 2013, Dr. Hagan retained counsel, who in turn contacted Northwestern concerning a review of Dr. Hagan's LTD claim. (*Id*. at NM 15-02722-000209.) Northwestern responded by requesting Dr. Hagan's signed authorization to release his confidential information to counsel. (*Id*. at NM 15-02722-000207.) Counsel did not respond to this request. Due to subsequent unsuccessful attempts to contact both counsel and Dr. Hagan directly concerning the release, Northwestern did not begin its review. (*Id*. at NM 15-02722-000205-6.) Northwestern did not hear from Dr. Hagan or counsel again until January of 2014 when counsel reinitiated efforts for a review of Dr. Hagan's LTD claim. (*Id*.

request for review, Dr. Hagan neither submitted additional evidence to be considered nor provided a rationale for his disagreement with Northwestern's closure of his LTD claim. (*Id*. at NM 15-02722-0000209.) The ARU completed its review and mailed its findings in a letter to Dr. Hagan on August 15, 2014. (*Id*. at NM 15-02722-0000162-4.) The ARU concluded that the decision to close Dr. Hagan's claim, based upon the information in his file, was correct and must be upheld. (*Id.*) This letter contained a breakdown of Dr. Hagan's earnings, including his salary from January 7, 2012 to October 27, 2012 and additional income amounts,[5] as well as an explanation of the calculations used to determine that Dr. Hagan was earning more than 80% of his Predisability Earnings. (*Id*.) Dr. Hagan filed his Amended Complaint on March 4, 2016. (Am. Compl., DN 19.) Northwestern's Counterclaim for the recovery of overpaid benefits and Motion for Judgment on the Administrative Record followed. (Countercl., DN 22; Def.'s Motion, DN 31.)

## II. STANDARD

A civil action for the denial of long-term disabilities under a group insurance plan may be brought in this court pursuant to 29 U.S.C. § 1132(a)(1)(B). On a motion for judgment on the administrative record, the denial of benefits "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). When the administrator or fiduciary has discretionary power under the plan, it is well-settled that the arbitrary and capricious standard of review applies. *Davis v. Kentucky Finance Cos. Retirement Plan*, 887 F.2d 689, 693 (6th Cir. 1989); *Killian v.*

---

at NM 15-02722-000203.) Dr. Hagan's counsel submitted the signed release on July 29, 2014. (*Id*. at NM 15-02722-000199.) Northwestern agreed to conduct a review even though this release was not obtained within 180 days. (*Id*. at NM 15-02722-000202.)

[5] Dr. Hagan's financial records reveal four income amounts distinct from his salary, characterized as "Other – Nelson," totaling over $24,000.00. (Id. at NM 15-02722-000163.)

*Healthsource Provident Adm'rs, Inc*., 152 F.3d 514, 520 (6th Cir. 1998); *Evans v. UnumProvident Corp.*, 434 F.3d 866, 875 (6th Cir. 2006).

The arbitrary and capricious standard is highly deferential; it is the "least demanding form of judicial review of administrative action." *Davis*, 887 F.2d at 693 (citing *Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir. 1985)). A decision is not arbitrary and capricious when "it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome." *Evans*, 434 F.3d at 476 (citing *Killian*, 152 F.3d at 520). Therefore, an administrator's decision will be upheld "if it is the result of a deliberate principled reasoning process" supported by evidence. *Id*. Lastly, the court's review under this standard is limited to the evidence contained in the administrative record. *Kalish v. Liberty Mut./Liberty Life Assurance Co. of Boston*, 419 F.3d 501, 511 (6th Cir. 2005).

On Northwestern's motion, the court will review the administrative record under the arbitrary and capricious standard. The language of the Policy is clear, and neither party disputes, that Northwestern has discretionary powers of decision-making. The Policy states in a section entitled "Allocation of Authority," that "the Company has full and exclusive authority to control and manage the Policy, to administer claims, and to interpret the Policy and resolve all questions arising in the administration, interpretation, and application of the Policy." (*Id*. at NM 15-02722-000034.) This language sufficiently endows the administrator of the Policy with discretionary power such that the arbitrary and capricious standard will apply.

Further, courts are cognizant of the potential conflict of interest inherent in a system that allows for an administrator to evaluate and pay on a disability claim, even when the administrator is, as here, a professional insurance company. The Supreme Court tackled this issue directly in *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008). Therein, the Court

found that this potential conflict does not alter the applicable standard of review. *Id*. at 115. Rather, it should be considered simply as a factor, as one of the "several different considerations" examined when determining whether a denial is arbitrary and capricious. *Id*. at 117. As such, the weight of this factor will depend on the facts of each case. A discussion of any potential conflict of interest as it applies to Northwestern's denial of Dr. Hagan's disability claim will be articulated below.

## III. DISCUSSION

The court is now tasked with determining whether Northwestern's decision to uphold the denial of Dr. Hagan's LTD benefits was arbitrary and capricious, and then with determining whether Northwestern is entitled to equitable relief for overpayment of LTD benefits pursuant to its Counterclaim.

### a. *Termination of LTD Benefits*

Upon Northwestern's Motion, the court must look to whether Northwestern can "offer a reasoned explanation, based on the evidence" for terminating Dr. Hagan's benefits. *Evans*, 434 F.3d at 476. We find that Northwestern's stated basis for its initial termination of LTD benefits in November of 2012, and its stated basis for upholding this denial on review in August of 2014, are the products of deliberate, principled reasoning processes. Therefore, the termination of Dr. Hagan's LTD benefits was not arbitrary and capricious.

Firstly, the court finds that there is sufficient evidence to support Northwestern's conclusion that Dr. Hagan does not meet the Own Occupation Definition of Disability. In its initial benefit termination letter, Northwestern included the language of the Own Occupation Definition of Disability from the Policy, which states that a policy member is disabled when he is unable to perform "with reasonable continuity the Material Duties" of his occupation.

Northwestern then explained that Dr. Hagan was performing the Material Duties of a physician full-time and therefore did not fit this definition. This is supported by the administrative record. Dr. Hagan's CPT codes indicate that between April 2012 and October 2012, the time he was receiving LTD benefits, he was continuously performing tasks typical of a family physician including: seeing and treating patients in his office, completing physical examinations, administering vaccines and injections, and diagnosing illnesses, among many others. (*Id*. at NM 15-02722-0000379-86.) Additionally, Dr. Hagan admitted that he was working as a physician full time, even if at a slower pace. Therefore, we find that Northwestern's explanation for why Dr. Hagan did not meet the Own Occupation Definition of Disability was a reasoned determination supported by evidence.

Dr. Hagan suggests that Northwestern's decision was arbitrary and capricious because Northwestern "ignored its own physicians" when it terminated benefits under the Own Occupation Definition of Disability. As support, Dr. Hagan explains that "both of the Plaintiff's treating physicians and the Defendant's reviewing physician, Dr. Child, were clear that Dr. Hagan would be unable to read and use a computer without great difficulty, to perform surgeries, pap smears, and other delicate procedures." However, this argument misses the mark.

Northwestern has repeatedly recognized that Dr. Hagan's injury has rendered him blind in his right eye, which has affected some of the duties he can perform and the speed at which he can complete some tasks. Indeed, in its 2012 letter terminating his benefits, Northwestern stated that, "we acknowledge and understand that you are working with a medical condition that has reduced your functional work capacity." (*Id*. at NM 15-02722-0000172.) Yet, Northwestern found that despite this reduced capacity, his voluntary return to full-time hours and the performance of many other Material Duties, evidenced by his CPT codes, precluded him from

meeting the Own Occupation Definition of Disability.  (*Id*. at NM 15-02722-0000170.)  This is a reasonable conclusion based on the evidence.

The court likewise holds that Northwestern's determination that Dr. Hagan does not meet the Partial Disability Definition is not the product of arbitrary and capricious findings.  Unlike the Own Occupation Definition of Disability, the Partial Definition of Disability rests on a calculation of earnings rather than an examination of a policy member's limitations in performing occupational duties.  Significantly, the definition requires that the policy member be "unable to earn more than the Own Occupation Income Level," which is 80% of the member's Indexed Predisability Earnings.

In its 2012 letter, Northwestern re-stated the Partial Disability Definition, explained its calculation of Dr. Hagan's Own Occupation Income Level, provided a summary of his billed charges and financial documents, and explained how this evidence led to the conclusion that Dr. Hagan was earning more than his Own Occupation Level.  When Dr. Hagan requested an administrative review of his claim, he did not dispute this calculation or the underlying financial information.  The ARU's letter upholding the denial reiterates, in detail, the calculations used to support its finding that Dr. Hagan did not meet the Partial Disability Definition.  Absent evidence contradicting or supplementing the underlying financial documents, and absent any evidence that the calculations themselves were in error, we cannot conclude that Northwestern's termination of LTD benefits was arbitrary and capricious.

Finally, the court must consider if Northwestern's dual role in evaluating and paying Dr. Hagan's claim contributed to its decision to terminate benefits. In doing so, the court will examine "whether circumstances suggest a higher likelihood that [the conflict] affected the benefits decision."  *Metropolitan*, 554 U.S. at 117.  Dr. Hagan urges us to attach significant

weight to the apparent conflict of interest in this case. More specifically, Dr. Hagan asserts that Northwestern's use of in-house reviewers and its heavy focus on "a calculation of numbers on income" are substantial indicators that the conflict of interest influenced the outcome of his claim. We find that neither of these factors, viewed in conjunction with Northwestern's reasoned explanations for terminating Dr. Hagan's claim, tip the balance of the scale towards finding the denial of benefits arbitrary and capricious.

First, Courts have recognized that there is "nothing inherently objectionable" about in-house administrative reviewers. *Evans*, 434 F.3d at 877. It is not until the reviewer ignores medical evidence or relies on inadequate data, for example, that the use of in-house reviewers may indicate a conflict. *Id*. at 878. As articulated in detail previously, the record does not support Dr. Hagan's claim that his medical records and the opinions of his treating physicians were ignored. Neither does the record indicate that Northwestern's reviewers relied upon inaccurate data.

We likewise reject Dr. Hagan's argument that Northwestern's reliance on income calculations for denying disability indicates that the conflict of interest was determinative in this case. As the court has also already articulated in detail, the Partial Definition of Disability under the Policy requires that a member earn less than his Predisability Earnings. This definition therefore necessitates an income calculation and the court cannot hold that this calculation indicates a conflict of interest.

In sum, the court cannot find that Northwestern's termination of LTD benefits was arbitrary and capricious.

### b. Recovery of Overpaid Benefits

Because the court finds that Northwestern's termination of LTD benefits was not arbitrary and capricious, we now must turn to whether Northwestern is entitled to the recovery of overpaid benefits.

Under ERISA, a fiduciary may bring a civil action:

> (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132(a)(3). Additionally, a policy administrator may be a fiduciary even if not specifically named as such:

> Except as otherwise provided in subparagraph (B), a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets.

29 U.S.C.A. § 1002(21)(A). As previously held, Northwestern holds discretionary power under the language of the Policy; thus, Northwestern is a fiduciary and may bring a civil action under the statute.

Within the past few decades, the Supreme Court has clarified the types of relief available to fiduciaries under ERISA. The Court has clearly "rejected a reading of the statute that would extend the relief obtainable under § 502(a)(3) to whatever relief a court of equity is empowered to provide in the particular case at issue." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002). Rather, the equitable relief available to fiduciaries is limited to "those categories of relief that were *typically* available in equity." *Id*. (quoting *Mertens v. Hewitt Associates*, 508 U.S. 248, 256 (1993)) (emphasis in original).

One such remedy typically available in equity is the imposition of a constructive trust or equitable lien, whereby "money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *Id*. at 213. A few years later, the Supreme Court reaffirmed the use of a constructive trust or equitable lien as a tool for recovery in ERISA cases, emphasizing that it can be enforced "only against specifically identified funds that remain in the defendant's possession or against traceable items that the defendant purchased with the funds." *Montanile v. Board of Trustees of Nat. Elevator Industry Health Benefit Plan*, 136 S.Ct. 651, 660 (2016). In the case that all the specifically identifiable funds are completely dissipated, the Court is clear that the lien cannot attach to "general assets instead because those assets were not part of the specific thing to which the lien attached." *Id*. at 659.

In the present case, Northwestern has an equitable lien on the overpayment of benefits. There is a provision in the Policy entitled "Overpayment Of Claim," under the section "Rules for Other Income" which states:

> You must immediately repay the Company any overpayment of your claim. The Company will notify you of the amount of any overpayment of your claim under any group disability insurance policy issued by the Company. You will not receive any benefits until the Company has been repaid in full. In the meantime, any benefits paid, including the Minimum Benefit, will be applied to reduce the amount of the overpayment. The Company may charge you interest at the legal rate for any overpayment which is not repaid within 30 days after the Company first mails you notice of the amount of the overpayment.

(Admin. R. at NM 15-02722-000026.) Additionally, in August of 2012, after it had initially approved Dr. Hagan's LTD claim, Northwestern sent Dr. Hagan a "Reimbursement Agreement." This agreement, signed by Dr. Hagan, reaffirmed that Dr. Hagan's Work Earnings "may result in an overpayment of Long Term Disability Payments" and that Dr. Hagan was "responsible for immediately repaying Northwestern Mutual for any overpayment of Long Term

- 13 -

Disability benefits that may result from [his] or [his] family's entitlement to other income benefits." (Id. at NM 15-02722-000260.)

The Sixth Circuit has held that similar language in a group long term disability plan satisfies the requirement for an "express lien against a specifically identified fund." *Gilchrest v. Unum Life Ins. Co. of America*, 255 Fed.Appx. 38, 45-46 (6th Cir. 2007). The disability plan in *Gilchrest* stated that "Unum has the right to recover any overpayments due to: fraud; any error Unum makes in processing a claim; and your receipt of deductible sources of income. You must reimburse us in full. We will determine the method by which the repayment is to be made. Unum will not recover more money than the amount we paid you." *Id*. at 45.

The Court in *Gilchrest* recognized that upon cursory review, Unum's provision does not appear to satisfy the requirement for an express lien against a specifically identified fund. *Id*. Yet, the Court found that, "[w]hen we pause to consider that Unum is seeking to recover overpayments, however, the provisions do satisfy the requirements." *Id*. The Sixth Circuit explained that, "the Plan's overpayment provision asserts a right to recover from a specific fund distinct from Gilchrest's general assets – the fund being the overpayments themselves – and a particular share of that fund to which the Plan was entitled – all overpayments due to the receipt of Social Security Benefits, but not to exceed the amount of benefits paid." *Id*. at 45-46. On this premise, the Court in *Gilchrest* affirmed the entry of summary judgment in favor of the insurance company on its counterclaim to recover overpayments.

The court finds that in the current case, the language under the Policy and the Reimbursement Agreement effectively create a constructive trust or equitable lien on the overpayment of benefits to Dr. Hagan due to his Work Earnings. The Plan seeks to recover the specific fund of the overpayments, which, per *Gilchrest*, is a fund distinct from Dr. Hagan's

general assets. Northwestern further seeks a particular share of that fund to which it is entitled, that is, the overpayment of benefits due to Dr. Hagan's work earnings. Northwestern has calculated that the overpayments amount to $24,800.08, an amount that Dr. Hagan has not provided evidence to contradict. Therefore, the court finds that an equitable lien has attached to the fund of overpayments in Dr. Hagan's possession in the amount of $24,800.08 and Northwestern is entitled to the amount remaining in Dr. Hagan's possession.

## IV. CONCLUSION

For the foregoing reasons:

The court will **GRANT** Defendant Northwestern Mutual Life Insurance Company's Judgment on the Administrative Record; the court will **DISMISS WITH PREJUDICE** Plaintiff Dr. Hagan's Amended Complaint; and judgment shall be entered in favor of Defendant Northwestern Mutual Life Insurance Company on its Counterclaim with respect to its claim for equitable relief pursuant to 29 U.S.C. § 1132(a)(3).

An order will be entered in accordance with this opinion.

October 10, 2017

Charles R. Simpson III, Senior Judge
United States District Court